## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE GEORGES, derivatively on behalf of ACTINIUM PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SANDESH SETH, AVINASH DESAI, MADHURI VUSIRIKALA, SERGIO GIRALT, STEVE O'LOUGHLIN, JEFFREY W. CHELL, DAVID NICHOLSON, AJIT S. SHETTY, and RICHARD I. STEINHART, <br><br> Defendants, <br><br> and <br><br> ACTINIUM PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-03738 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff George Georges ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Actinium Pharmaceuticals, Inc. ("Actinium" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Sandesh Seth ("Seth"), Avinash Desai ("Desai"), Madhuri Vusirikala ("Vusirikala"), Sergio Giralt ("Giralt"), Steve O'Loughlin ("O'Loughlin"), Jeffrey W. Chell ("Chell"), David Nicholson ("Nicholson"), Ajit S. Shetty ("Shetty), and Richard I. Steinhart ("Steinhart") (collectively, the

"Individual Defendants," and together with Actinium, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Actinium, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Seth, Desai, Vusirikala, and Giralt for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Actinium, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from October 31, 2022 through August 2, 2024, both dates inclusive (the "Relevant Period").

2.    Actinium is a biopharmaceutical company that develops late-stage targeted radiotherapies for treatment in patients who have failed existing oncology therapies. Among the therapies Actinium develops is Iomab-B, an induction-and-conditioning agent that is used prior to bone marrow transplants ("BMT") and may be able to assist treat elderly patients with relapsed or refractory ("R/R" acute myeloid leukemia ("AML").

3.    Iomab-B was evaluated by the Company through the Phase 3 Sierra trial (the "Sierra Trial"). The Sierra Trial saw Iomab-B meet its primary endpoint of durable Complete Remission ("DCR") with statistical significance. In essence, the drug's DCR measured whether the patient remained in total remission for over six months from the date of bone marrow sampling. DCR does not identify the amount of time the patient survives following the procedure, also known as Overall Survival ("OS"). OS was a secondary endpoint in the Sierra Trial. Per U.S. Food and Drug Administration ("FDA") guidelines, OS, as opposed to DCR, is a clinical endpoint that demonstrates a clinical benefit when approving a new AML treatment.

4.    During the Relevant Period, the Individual Defendants made a series of false and misleading statements that led investors to believe that Iomab-B would have a significant likelihood of FDA approval for a Biologics License Application ("BLA"). For example, on October 31, 2022, the Company issued a press release revealing its "positive top-line results" of the Sierra Trial. The press release reveals that "[t]he SIERRA trial produced positive topline results, meeting its primary endpoint of durable Comple Remission (dCR) for 6 months with statistical significance (p<0.0001). Actinium intends to submit a Biologics License Application (BLA) seeking approval for Iomab-B."

5.    The truth did not fully emerge until August 2, 2024, when the Company issued a press release announcing that following interactions with the FDA regarding a BLA for Iomab-B, revealing that despite the positive outcome of the Sierra Trial, the FDA would be requiring an OS benefit trial in advance of the BLA filing.

6.    On this news, the price of the Company's stock fell $3.69 per share, or approximately 60%, from a close of $6.17 per share on August 2, 2024, to close at $2.48 per share on August 5, 2024.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that:  (1) the data the Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

9.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), Chief Medical Officer ("CMO"), its Vice President ("VP"), Clinical Development BMT and Cellular Therapy, and a member of the

Company's Scientific Advisory Board to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the Company's directors' receipt of material benefits due to the amendment to the 2019 Incentive Plan, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CMO's, the VP, Clinical Development BMT and Cellular Therapy's, the Scientific Advisory Board member's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.    Plaintiff is a current shareholder of Actinium. Plaintiff has continuously held Actinium stock since first purchasing shares on July 7, 2021.

### Nominal Defendant Actinium

18.    Actinium is a Delaware corporation with its principal executive offices at 100 Park Avenue, 23rd Floor, New York, NY 10017. Actinium's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ATNM."

### Defendant Seth

19.    Defendant Seth has served as the Company's CEO since June 2017. He has also

served as a Company director since March 2012, and as Chairman of the Company's Board since

October 2013. Previously, he also served as the Company's Executive Chairman from August

2014 until June 2017.

20.    The Schedule 14A the Company filed with the SEC on November 5, 2024 (the

"2024 Proxy Statement") stated the following about Defendant Seth:

> Mr. Sandesh Seth has been our Chief Executive Officer since June 2017. Mr. Seth
> has been a Director since March 2012, our Chairman of the Board since October
> 2013, and served as Executive Chairman from August 2014 to June 2017.
>
> Mr. Seth has 25+ years of experience in investment banking (Laidlaw& Co (UK)
> Ltd., Cowen & Co.), equity research (Bear Stearns, Commonwealth Associates)
> and in the pharma industry (Pfizer, Warner-Lambert, SmithKline in strategic
> planning, business development and R&D project management). Mr. Seth was
> chairman of Relmada Therapeutics Inc., a specialty pharma company focused on
> CNS therapeutics, which he helped co-found. Mr. Seth has an MBA in Finance
> from New York University; an M.S. in the Pharmaceutical Sciences from the
> University of Oklahoma Health Center and a B.Sc. in Chemistry from Bombay
> University. He has published several scientific articles and was awarded the
> University Regents Award for Research Excellence at the University of Oklahoma.
> Mr. Seth was designated as Regulatory Affairs Certified by the Regulatory Affairs
> Professionals Society which signifies proficiency with U.S. FDA regulations. He
> has several patents related to use of radiopharmaceuticals as conditioning agents
> for adoptive cell therapies and as therapeutic combinations.
>
> That Mr. Seth has served in various business executive-level positions over the
> course of his career, has significant investment banking experience, has developed
> significant management, operational and leadership skills and is well accustomed
> to interfacing with investors, analysts, auditors, C-level executives, and outside
> advisors, led us to conclude that Mr. Seth should serve as a director.

**Defendant Desai**

21.    Defendant Desai has served as the Company's CMO since September 2021.

Previously, he also served as the Company's Executive Vice President Clinical Development,

Clinical Operations, and Medical Affairs from November 2020 until September 2021.

22.     The Leadership Team page of the Company's website[1] states the following about

Defendant Desai:

> Avinash is an industry veteran in the hematology and oncology field, most recently serving as Vice President, Head of U.S. Medical Affairs – Oncology at Glaxo Smith Kline (GSK). Over the course of his twenty-five-year career, Avinash successfully designed and implemented clinical development, U.S. and global medical affairs, and life cycle management plans for a variety of pharmaceutical products. This has included participation in multiple INDs, NDAs, and sNDA submissions and efficiently managing the product Scientific Advisory Boards (SAB) and Data and Safety Monitoring Boards (DSMB) for hematology, oncology and therapeutic candidates. At GSK, he established the U.S. medical affairs oncology team that oversaw the launch readiness plans for three novel oncology products—Blenrep® in multiple myeloma, Zejula® in ovarian cancer, and dostarlimab in endometrial cancer. In addition to GSK, Avinash has overseen the clinical development, implementation and delivery of oncology life cycle management plans for various oncology therapies at several leading global pharmaceutical companies, including Eli Lilly & Company (Lilly), Janssen Pharmaceuticals, Inc. and Takeda, Inc. Prior to GSK, he was the VP of Global Medical Affairs at Lilly, during which time he oversaw the global medical affairs team for Lilly's GI Oncology portfolio. Earlier in his career, Avinash contributed to the approval of Janssen's myeloma drug Darzalex® (daratumumab) and leading and strategically executing medical affairs activities globally for Velcade® (bortezomib). Prior to Janssen, Avinash was responsible for the international development of oncology products in solid tumors and hematological malignancies at Sanofi, where he successfully executed pivotal trials that led to NDA submission for Jevtana® (cabazitaxel).

**Defendant Vusirikala**

23.     Defendant Vusirikala has served as the Company's VP, Clinical Development

BMT and Cellular Therapy since October 2022.

24.     The Leadership Team page of the Company's website states the following about

Defendant Vusirikala:

> Madhuri is an accomplished bone marrow transplant physician and hematologist with over 20 years of clinical experience. She is board certified in internal medicine, hematology and oncology. Madhuri joins Actinium from UT Southwestern Medical Center in Dallas, Texas, where she has been a Professor of Internal Medicine in the Division of Hematology/Oncology and Medical Director of the Adult Allogeneic Bone Marrow Transplant Program. She specialized in managing a variety of

---

[1] https://www.actiniumpharma.com/about/management-team

hematologic malignancies and performing allogeneic bone marrow transplants for these patients when indicated. She also served as primary investigator for most of the clinical trials at UT Southwestern related to BMT. Madhuri earned her medical degree (M.B.B.S.) at India's Lady Hardinge Medical College before completing an internal medicine internship at Maulana Azad Medical College-Delhi University and an internal medicine internship and residency at The State University of New York, Syracuse. She also completed a hematology and oncology fellowship at the University of Pittsburgh and an advanced fellowship in bone marrow transplantation at Vanderbilt University Medical Center. Madhuri is a member of the American Society of Hematology, American Society of Transplantation and Cellular Therapy. She serves as a member on the NCCN panels for Hematopoietic Cell Transplantation and Acute Lymphoblastic Leukemia committees.

### Defendant Giralt

25.    Defendant Giralt serves as a member of the Company's Scientific Advisory Board. In addition, Defendant Giralt served as an investigator on the Sierra Trial

### Defendant O'Loughlin

26.    Defendant O'Loughlin has served as the Company's Chief Financial Officer ("CFO") since August 2020. Defendant O'Loughlin has also served various roles at the Company since first joining the Company in October 2015, most recently serving as the Company's Principal Financial Officer from May 2017 until August 2020.

27.    The 2024 Proxy Statement stated the following about Defendant O'Loughlin:

Steve O'Loughlin has been our Chief Financial Officer since August 2020. Mr. O'Loughlin served as our Principal Financial Officer from May 2017 to August 2020. Mr. O'Loughlin joined Actinium in October 2015 as Vice President, Finance and Corporate Development, with almost a decade of life sciences industry experience gained from previous positions in investment banking and publicly traded life sciences companies. Prior to Actinium, from June 2015 to October 2015, Mr. O'Loughlin worked at J. Streicher LLC as an investment banker, from August 2012 to June 2015 Mr. O'Loughlin held the position of vice president, corporate finance and development and was a corporate officer at Protea Biosciences, Inc., a publicly traded life sciences tools company. Previously, From June 2010 to June 2012, Mr. O'Loughlin held corporate development positions with Caliber I.D., a publicly traded diagnostics company. Mr. O'Loughlin previously worked in investment banking at Jesup & Lamont where he focused on the biotechnology and life sciences industries. Mr. O'Loughlin has a B.S. in Business Administration with a concentration in finance from Ramapo College of

New Jersey.

**<u>Defendant Chell</u>**

28.     Defendant Chell has served as a Company director since April 2018. He also

serves as a member of the Audit Committee, and the Compensation Committee.

29.     The 2024 Proxy Statement stated the following about Defendant Chell:

Dr. Chell has been a Director of the Company since April 2018. Dr. Chell is also a
member of our Audit Committee and Compensation Committee. He has been the
chief executive officer emeritus of the National Marrow Donor Program ("NMDP")
since 2017 having served as its chief executive officer since 2000. Dr. Chell has led
the NMDP through transformational growth as its Be The Match Registry tripled
to more than 12 million donors, the number of transplants facilitated has grown
fivefold to over 6,400 annually, and revenue more than tripled to nearly
$400 million per year. He is also the co-founder and has served as executive
director of the Center For International Blood & Marrow Transplant Research since
2004, a leading research program in the field contributing over 70 research
publications per year in peer-reviewed journals. Dr. Chell serves as the President
of the Jeff Gordon Children's Foundation, a non-profit that funds innovative
research and therapy for pediatric cancer patients. He also currently serves as chair
of CLR Insurance, a captive insurance company domiciled in the Cayman Islands.
From 2014 to 2016, Dr. Chell served as co-chair of Bone Marrow Donors
Worldwide during its IT transformation project, improving revenues and reducing
costs.

Prior to joining the NMDP, he served as president, Allina Medical Clinics, a 450
physician multi-specialty medical group from 1994 to 1999. Prior to that he
practiced Internal Medicine in Minneapolis and in the U.S. Air Force Medical
Corps.

Dr. Chell received his M.D. from the University of Minnesota and his training in
Internal Medicine at the University of Wisconsin, Madison. Dr. Chell is a diplomate
of the American Board of Internal Medicine, a member of the American Society of
Hematology and a member of the American Society of Blood and Marrow
Transplantation.

He has received multiple honors including the 2018 Public Service award of the
American Society For Blood and Marrow Transplantation, 2017 Most Admired
CEO by the Minneapolis/St. Paul Business Journal, 2010 Healthcare Executive of
the Year by the Minneapolis/St, Paul Business Journal, and the 2017 Bone Marrow
Foundation Service Award.

That Dr. Chell brings many years of experience with patient donor programs, knowledge of challenges related to bone marrow transplants, leadership of organizations and experience working in medical groups to our Board, led us to conclude that Dr. Chell should serve as a director.

**Defendant Nicholson**

30.      Defendant Nicholson has served as a Company director since 2008. He also serves

as the Lead Independent Director and as the Chair of the Compensation Committee.

31.      The 2024 Proxy Statement stated the following about Defendant Nicholson:

David Nicholson Ph.D., serves as our Lead Independent Director of our Board and has been a Director of the Company since 2008. Dr. Nicholson is also a member of our Compensation Committee. Since March 2015, Dr. Nicholson served as Executive Vice President and Chief R&D Officer of Allergan, which was acquired by Abbvie in May 2020. In August 2014, Dr. Nicholson joined Allergan (previously known as Actavis plc and Forest Laboratories, Inc.) as senior vice president, Actavis Global Brands R&D. From March 2012 to August 2014, Dr. Nicholson was on the executive committee of Bayer CropScience as head of research & development responsible for the integration of the company's R&D activities into one global organization. Dr. Nicholson graduated in pharmacology, earning his B.Sc. from the University of Manchester (1975) and his Ph.D. from the University of Wales (1980). Between 1978 and 1988, Dr. Nicholson worked in the pharmaceutical industry for the British company Beecham-Wülfing in Gronau, Germany. The main emphasis of his activities as group leader in a multidisciplinary project group was the development of cardiovascular drugs.

From 1988-2007, Dr. Nicholson held various positions of increasing seniority in the UK, the Netherlands and the U.S. with Organon, a business unit of Akzo Nobel. Ultimately, he became executive vice president, research & development, and member of the Organon Executive Management Committee. He implemented change programs, leading to maximizing effectiveness in research & development, ensuring customer focus and the establishment of a competitive pipeline of innovative drugs. In 2007, Dr. Nicholson transferred to Schering-Plough, Kenilworth, New Jersey as senior vice president, responsible for Global Project Management and Drug Safety. From 2009 to December 2011, he was vice president licensing and knowledge management at Merck in Rahway, New Jersey, reporting to the president of Merck R&D. As an integration team member, Dr. Nicholson played a role in the strategic mergers of Organon BioSciences, the human and animal health business of Dutch chemical giant Akzo-Nobel, and Schering-Plough in 2007 as well as of Schering-Plough and Merck in 2009. Dr Nicholson brings a wealth of experience having previously championed the breakthrough anti-PD1 cancer drug Keytruda® (pembrolizumab) all the way from its earliest research and into development, heralding a revolution in cancer therapy.

That Dr. Nicholson brings over 40 years of pharmaceutical experience to our Board, having served in various pharmaceutical research and development executive-level positions over the course of his career, that he presently serves on the Boards of Adverum Biotechnologies, Wild Biosciences and Volastra Therapeutics, and that Dr. Nicholson has developed significant management and leadership skills relating to the pharmaceutical industry and is well accustomed to interfacing with investors, analysts, auditors, outside advisors and governmental officials, led us to conclude that Dr. Nicholson should serve as a director.

**Defendant Shetty**

32.    Defendant Shetty has served as a Company director since March 2017. He also serves as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee and the Compensation Committee.

33.    The 2024 Proxy Statement stated the following about Defendant Shetty:

Dr. Shetty has been a Director of the Company since March 2017. Dr. Shetty is also a member of our Audit Committee, Compensation Committee, and Chairman of our Nominating and Corporate Governance Committee. Dr. Shetty joined Janssen Pharmaceutical, Inc. ("Janssen") in 1976 ultimately rising to the position of president in 1986 where he led the establishment of Janssen's business in the U.S. From 1999 to 2008 he was managing director of Janssen, during this time the Janssen Group of companies' global sales grew from $1 billion to $8 billion, and from 2004 until 2012 he was chairman of the board of directors. In Dr. Shetty's most recent role at Johnson & Johnson he was head of Enterprise Supply Chain, where he reported to the chief executive officer and was responsible for the transformation and optimization of Johnson & Johnson's supply chain. Dr. Shetty earned a Ph.D. in Metallurgy and B.A. Natural Sciences from Trinity College, Cambridge University and a Master of Business Administration from Carnegie Mellon University. In 2007, Dr. Shetty was bestowed the title of Baron by King Albert II of Belgium for his exceptional merits. In addition, he was elected Manager of the Year in 2004 in Flanders and received a Life-Time Achievement Award in India in 2010. In 2016, Dr. Shetty was named as chairperson of the Vlaams Instituut voor Biotechnologie (VIB), a Belgium based life sciences research institute focused on translating scientific results into pharmaceutical, agricultural and industrial applications. Dr. Shetty has served as a member of Agile Therapeutics, Inc.'s board of directors from February 2016 until May 2023. We believe Dr. Shetty's qualifications to sit on our Board include his extensive pharmaceutical experience leading commercial and supply chain operations and his significant education background.

That Dr. Shetty has more than 30 years of leadership and executive experience in

the pharmaceutical industry, that he has significant supply chain knowledge and that he has experience conducting business in the U.S. and Europe, led us to conclude that Dr. Shetty should serve as a director.

**Defendant Steinhart**

34.     Defendant Steinhart has served as a Company director since November 2013. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

35.     The 2024 Proxy Statement stated the following about Defendant Steinhart:

Mr. Steinhart has served as our Director and Chairman of the Audit Committee since November 2013. Mr. Steinhart is also a member of our Nominating and Corporate Governance Committee. Since October 2017 Mr. Steinhart has been the senior vice president and chief financial officer of BioXcel Therapeutics, Inc. Since March 2014, Mr. Steinhart has been a member of the board of directors of Atossa Genetics, Inc. where he is chairman of the audit committee and a member of the compensation committee. From October 2015 to April 2017, Mr. Steinhart was vice president and chief financial officer at Remedy Pharmaceuticals, a privately-held, clinical stage pharmaceutical company that sold its only asset, CIRARA, to Biogen for $120M plus earn-outs. From January 2014 through September 2015 Mr. Steinhart worked as a financial and strategic consultant to the biotechnology and medical device industries. Previously, Mr. Steinhart was senior vice president, finance and chief financial officer at MELA Sciences, Inc. from April 2012 until December 2013, having previously served as vice president, finance and chief financial officer, treasurer and secretary from April 2006. From May 1992 until joining MELA Sciences, Mr. Steinhart was a managing director of Forest Street Capital/SAE Ventures, a boutique investment banking, venture capital, and management consulting firm focused on healthcare and technology companies. Prior to Forest Street Capital/SAE Ventures, he was vice president and chief financial officer of Emisphere Technologies, Inc. Mr. Steinhart's other experience includes seven years at CW Group, Inc., a venture capital firm focused on medical technology and biopharmaceutical companies, where he was a general partner and chief financial officer. Mr. Steinhart began his career at Price Waterhouse, now known as PricewaterhouseCoopers. He holds BBA and MBA degrees from Pace University and is a Certified Public Accountant (inactive).

That Mr. Steinhart brings more than 35 years of financial experience to our Board, having served in various executive-level financial positions over the course of his career, and that Mr. Steinhart is a certified public accountant (inactive), led us to conclude that Mr. Steinhart should serve as a director and chair the Audit Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.    By reason of their positions as officers, directors, and/or fiduciaries of Actinium and because of their ability to control the business and corporate affairs of Actinium, the Individual Defendants owed Actinium and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Actinium in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Actinium and its shareholders so as to benefit all shareholders equally.

37.    Each director and officer of the Company owes to Actinium and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

38.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Actinium, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.    To discharge their duties, the officers and directors of Actinium were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Actinium, the absence of good faith on their part, or a

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Actinium's Board at all relevant times.

41.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

42.     To discharge their duties, the officers and directors of Actinium were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Actinium were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Actinium's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Actinium conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Actinium and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Actinium's operations would comply with all applicable laws and Actinium's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43.     Each of the Individual Defendants further owed to Actinium and the shareholders the duty of loyalty requiring that each favor Actinium's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Actinium and were at all times acting within the course and scope of such agency.

45.     Because of their advisory, executive, managerial, directorial, and controlling positions with Actinium, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

46.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Actinium.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

49.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Actinium was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Actinium, and was at all times acting within the course and scope of such agency.

<u>**ACTINIUM'S CODE OF CONDUCT**</u>

52.    Actinium's Code of Conduct "directors, officers and employees of" the Company. Additionally, the Code of Conduct "helps ensure compliance with legal requirements and our standards of business conduct."

18

53.     Under the heading "Compliance is Everyone's Business," the Code of Conduct states the following, in relevant part:

> Ethical business conduct is critical to the business of the Corporation. Each director, officer or employee has a responsibility is to respect and adhere to these practices. Many of these practices reflect legal or regulatory requirements. Violations of these laws and regulations can create significant liability for the violator, the Corporation, its directors, officers, and other employees.
>
> Part of the job and ethical responsibility of each director, officer and employee is to help enforce this Code. Each director, officer and employee should be alert to possible violations and report possible violations to the CEO and/or CFO.

54.     Under the heading "Your Responsibilities to the Corporation and its Stockholders," in the subsection, "General Standards of Conduct," the Code of Conduct states the following:

> The Corporation expects all directors, officers, employees, agents and contractors to exercise good judgment to ensure the safety and welfare of employees, agents and contractors and to maintain a cooperative, efficient, positive, harmonious and productive work environment and business organization. These standards apply while working on our premises, at offsite locations where our business is being conducted, at Corporate-sponsored business and social events, or at any other place where any director, officer or employee is acting as a representative of the Corporation. Directors, officers, employees , agents or contractors who engage in misconduct or whose performance is unsatisfactory may be subject to corrective action, up to and including termination.

55.     Under the same heading, in the subsection, "Applicable Laws," the Code of Conduct states the following:

> All Corporate directors, officers, employees, agents and contractors must comply with all applicable laws, regulations, rules and regulatory orders. Corporate directors, officers and employees located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws. Each director, officer, employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the CEO and/or CFO on specific Corporate policies and procedures. Violations of laws, regulations, rules and orders may subject the director, officer, employee, agent or contractor to individual criminal or civil

liability, as well as to discipline by the Corporation. Such individual violations may also subject the Corporation to civil or criminal liability or the loss of business.

56.     Under the same heading, in the subsection "Conflicts of interest," the Code of

Conduct states the following, in relevant part:

> Each director, officer and employee has a responsibility to the Corporation, the stockholders and each other.
>
> Although this duty does not prevent any director, officer and employee from engaging in personal transactions and investments, it does demand avoiding situations where a conflict of interest might occur or appear to occur. The Corporation is subject to scrutiny from many different individuals and organizations.
>
> Each director, officer and employee should always strive to avoid even the appearance of impropriety.

57.     Under the same heading, in the subsection "Obligations under Securities Laws-

'Insider' Trading," the Code of Conduct states the following, in relevant part:

> Obligations under the U.S. securities laws apply to everyone. In the normal course of business, officers, directors, employees, agents, contractors and consultants of the Corporation may come into possession of significant, sensitive information. This information is the property of the Corporation, and any director, officer or employee in possession of such information has been entrusted with it. No director, officer or employee may profit from it by buying or selling securities on their own behalf, or passing on the information to others to enable them to profit or for them to profit on behalf of such director, officer or employee. The purpose of this policy is both to inform all Corporate employees of the legal responsibilities and to make clear that the misuse of sensitive information is contrary to Corporate policy and U.S. securities laws.

58.     Under the same heading, in the subsection "Maintaining and Managing Records,"

the Code of Conduct states the following:

> The purpose of this policy is to set forth and convey the Corporation's business and legal requirements in managing records, including all recorded information regardless of medium or characteristics. Records include paper documents, CDs, computer hard disks, email, floppy disks, microfiche, microfilm or all other media. Local, state, federal, foreign and other applicable laws, rules and regulations require the Corporation to retain certain records and to follow specific guidelines in managing its records. Civil and criminal penalties for failure to comply with such

guidelines can be severe for directors, officers, employees, agents, contractors and the Corporation, and failure to comply with such guidelines may subject the director, officer, employee, agent or contractor to disciplinary action, up to and including termination of employment or business relationship at the Corporation's sole discretion. All original executed documents that evidence contractual commitments or other obligations of the Corporation must be forwarded to the CFO promptly upon completion. Such documents will be maintained and retained in accordance with the Corporation's record retention policies.

59.    Under the heading "Waivers," the Code of Conduct states the following:

Any waiver of any provision of this Code for a member of the Corporation's Board or an executive officer must be approved in writing by the Corporation's Board and promptly disclosed. Any waiver of any provision of this Code with respect any other employee, agent or contractor must be approved in writing by the CEO.

60.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ACTINIUM'S AUDIT COMMITTEE CHARTER

61.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

The Audit Committee of the Board of Directors (the "Board") of Actinium Pharmaceuticals, Inc. (the "Corporation") will make such examinations as are necessary to monitor the corporate financial reporting and external audits of the Corporation and its subsidiaries; to provide to the Board the results of its examinations and recommendations derived therefrom; to outline to the Board improvements made, or to be made, in internal accounting controls; to nominate an

independent auditor; and to provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters requiring Board attention.

In addition, the Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

62.    The Audit Committee Charter lists the following responsibilities of the Audit Committee:

1.  Reviewing with management and the independent auditor on a continuing basis the adequacy of the Corporation's system of internal controls (including any significant deficiencies and significant changes in internal controls reported to the Audit Committee by the independent auditor or management), accounting practices, and disclosure controls and procedures (and management reports thereon) of the Corporation and its subsidiaries.

2.  Reviewing the independent auditor's proposed audit scope and approach.

3.  Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvement provided to management by the independent auditor.

4.  Reviewing the performance of the independent auditor.

5.  Recommending the appointment of independent auditor to the Board, setting the independent auditor's compensation and pre-approving all audit services provided by the independent auditor.

6.  Pre-approving all audit and permitted non-audit and tax services to be performed by the independent auditor and establishing policies and procedures for the engagement of the independent auditor to provide permitted non-audit services.

7.  Reviewing with management and the independent auditor the annual and quarterly financial statements of the Corporation including (a) the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (b) any material changes in accounting principles or practices used in preparing the financial statement prior to the filing of a report on Form 10-K or Form 10-Q with the U.S. Securities and Exchange Commission ("SEC"); and (c) items required by Statement of Auditing Standards 61 and Statement of Auditing Standards 71 in the case of the quarterly statements.

8. Reviewing before release the un-audited quarterly operating results in the Corporation's quarterly earnings release, and financial information.

9. Overseeing compliance with SEC requirements for disclosure of auditor's services and Audit Committee members and activities;

10. Reviewing management's monitoring of compliance with the Corporation's Standards of Business Conduct and with the Foreign Corrupt Practices Act;

11. Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Corporation's financial statements;

12. Providing oversight and review of the Corporation's asset management policies, including an annual review of the Corporation's investment policies and performance for cash and short-term investments;

13. If necessary, instituting special investigations and, if appropriate hiring special counsel or experts to assist, for which the Corporation shall provide appropriate funding, as determined by the Committee, for payment of compensation to all advisors hired by the Committee.

14. Reviewing related party transactions for potential conflicts of interest;

15. Obtaining a report from the independent auditor at least annually regarding (a) the independent auditor's internal quality control procedures, (b) any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by an inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with such issues, and (d) all relationships between the independent auditor and the Corporation;

16. Establishing procedures for the confidential and anonymous receipt, retention and treatment of complaints regarding the Corporation's accounting, internal controls, and auditing matters;

17. Establishing policies for the hiring of employees and former employees of the independent auditor;

18. Conducting an annual performance evaluation of the Audit Committee and annually evaluate the adequacy of its charter; and,

19. Performing other oversight functions as requested by the full Board.

20. Monitor all activities to determine if there is any evidence of fraud.

63.    In violation of the Audit Committee Charter, the Individual Defendants (as key

officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

64.     Actinium is a biopharmaceutical company that develops late-stage targeted radiotherapies for treatment in patients who have failed existing oncology therapies. Among the therapies Actinium develops is Iomab-B, an induction-and-conditioning agent that is used prior to BMT and may be able to assist treat elderly patients with R/R AML.

65.     Iomab-B is made up of an anti-CD45 monoclonal antibody called apamistamab (formerly BC8) as well as the radioisotope I-131. Before a BMT, Iomab-B uses high doses of I-131 to achieve myeloablative conditioning.

66.     Starting in June 2016, Iomab-B was evaluated by the Company through the Phase 3 Sierra Trial. The Sierra Trial tested the potential use of Iomab-B as a treatment for R/R AML in patients aged fifty-five or older. The patients who participated in the Sierra Trial had "blast counts" (the amount of immature blood cells, or "blast cells") of at least 5% in their bone marrow or "circulating blasts" (the measurement of blast cells in the blood) that indicated the patient had

active AML. During the trial, the use of Iomab-B was compared to the control arm, which allowed a physician's choice of over twenty approved therapies, including chemotherapies. The control arm also included recently approved AML therapies that would be added to the Sierra protocol as they became available.

67.    The Sierra Trial also allowed for "crossover" between the treatment arm and the control arm of the study, in which patients who were unable to achieve complete remission on the control arm were allowed to receive Iomab-B treatment in an attempt to allow those patients to receive a BMT.

68.    Clinical trials are typically "double-blinded," meaning that the patients, investigators administering the study, and companies sponsoring the trial do not know whether a patient is part of the treatment arm or control arm, and what the results of the trial are as the trial continues. However, because of its design, comparing ongoing approved therapies to treatment with Iomab-B with a crossover, the Sierra Trial was not double-blinded.

69.    The Sierra Trial had a primary endpoint of DCR of six-months, with key secondary endpoints of OS and Event-Free Survival. The Sierra Trial also held an exploratory efficacy endpoint of OS in subjects randomized to the control arm that crossed over to receive Iomab-B compared with those in the control group who did not crossover.

70.    In June 2022, the Sierra Trial reached its primary completion date.

**False and Misleading Statements**

*October 31, 2022 Press Release*

71.    On October 31, 2022, the Company issued a press release announcing its supposedly "positive top-line results from" the Sierra Trial. The press release was also filed with the SEC on Form 8-K that same day.

25

72.    The press release quoted Defendant Desai, who highlighted the Company having

"delivered" successful results "for patients that need new treatment options" and "topline results

[that] move" the Company towards FDA approval of Iomab-B "given their statistical

significance," stating:

> We are excited that the randomized, controlled, multi-center, pivotal SIERRA trial
> has delivered these results for patients that need new treatment options. ***Our goal
> is to increase access to BMT and improve patient outcomes with Iomab-B, and
> these topline results move us in this direction given their statistical significance.
> We will continue to work on our Biologics License Application (BLA) submission
> to the US Food and Drug Administration (FDA) for approval of Iomab-B***. On
> behalf of Actinium, I'd like to thank the patients who took the leap of faith and
> enrolled in the SIERRA trial, their families and caregivers who supported them and
> the investigators who contributed their efforts and advice who made this trial
> possible. Without them it would not have been possible to yield these results that
> will enable us to continue to develop Iomab-B.

73.    The press release also quoted Defendant Seth, who touted how optimistic the

Company was about the results, stating:

> This is a significant milestone in Actinium's lifecycle and a testimony to the quality
> of our team who undertook a pioneering study in a patient population that is
> considered largely futile to treat. Despite being perennially under-staffed and under
> resourced, their passion and perseverance has yielded a clinically meaningful
> dividend. Our recently strengthened team is executing to enable our mission to
> disrupt the field of bone marrow conditioning with Iomab-B, first in r/r AML and
> then by building upon its robust prior clinical results in several hematological
> diseases. We look forward to sharing additional clinical data from the SIERRA trial
> by year end.

74.    The press release also revealed that:

> ***The SIERRA trial produced positive topline results, meeting its primary endpoint
> of durable Comple Remission (dCR) for 6 months with statistical significance
> (p<0.0001). Actinium intends to submit a Biologics License Application (BLA)
> seeking approval for Iomab-B to address patients age 55+ with r/r AML who
> cannot access BMT with currently available therapies***.

***November 3, 2022 Press Release***

75.    On November 3, 2022, the Company issued a press release announcing that it

would be presenting an oral presentation at the 64th Annual American Society of Hematology Meeting on December 10-13, 2022. The Press Release revealed that the presentation would be highlighting that "Iomab-B Treatment Significantly Increased Median Overall Survival in Relapsed or Refractory AML Patients with Highly Unfavorable TP53 Gene Mutation in the Phase 3 SIERRA Trial."

76.     The press release further quoted Defendant Desai as stating:

We are very excited by these results which show a statistically significant and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B. These results further support Iomab-B's differentiated profile and ability to improve outcomes for the most difficult to treat r/r AML patients.

***November 14, 2022 Form 10-Q***

77.     On November 14, 2022, the Company filed its quarterly report on Form 10-Q (the "Q3 2022 10-Q") for the third quarter of the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"). The Q3 2022 10-Q was signed by Defendants Seth and O'Loughlin and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Seth and O'Loughlin attesting to the accuracy of the Q3 2022 10-Q.

78.     In discussing the topline results of the Sierra Trial and the Company's intent to file a BLA for Iomab-B, the Q3 2022 10-Q stated:

***On October 31, 2022, we announced positive topline results from the SIERRA trial that Iomab-B met the study's dCR primary endpoint with a high degree of statistical significance (p<0.0001)***. Additional data from the SIERRA trial is expected to be presented by year-end 2022. Data from full patient enrollment in the SIERRA trial (153 patients), was previously presented at the Transplantation & Cellular Therapy (TCT) Tandem Meetings of ASTCT and CIBMTR, the combined annual meetings of the American Society for Transplantation and Cellular Therapy (ASTCT) and the Center for International Blood & Marrow Transplant Research (CIBMTR) in April 2022 and at ASH highlighting that 100% of patients (66/66) on the study arm that received a therapeutic dose of Iomab-B received a BMT, with a median time to BMT of 30 days, and all patients achieved neutrophil and platelet

engraftment in a median time of 18 days despite a high median blast count of 30%. On the control arm, only 18% of patients (14/77) achieved remission after salvage therapy, and then received a BMT with a median time to BMT of 67 days and median blast count of 20%. Of the 82% of patients failing to achieve a complete remission ("CR") with conventional care (63/77), 40 patients were eligible and elected to cross over to receive Iomab-B followed by transplant. These patients are considered as having failed the primary endpoint of the study. All crossover patients who received the therapeutic dose of Iomab-B (40/40) received a BMT, with a median time to BMT of 24 days and they achieved engraftment in a median time of 19 days despite high median blast count of 35% at time of crossover. It was also reported that 100-day TRM of the study or Iomab-B arm was 09% (6/65) of patients that received a BMT compared to 14% of patients (2/14) who received a BMT after salvage therapy on the control arm. These data support the value proposition of Iomab-B enabling patients access to BMT who would not otherwise be eligible and potentially better outcomes. ***Actinium intends to submit a Biologics License Application (BLA) in 2023, seeking approval for Iomab-B to address patients age 55+ with r/r AML who cannot access BMT with currently available therapies***. Iomab-B has been granted Orphan Drug Designation from the U.S. Food and Drug Administration (FDA) and has patent protection into 2037.

79.     In discussing the Company's cooperation with the FDA throughout the Sierra Trial, the Q3 2022 10-Q stated:

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, CD33 program candidates, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have favorable results in later clinical trials. We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA, pending results from the trial.

### *2022 Proxy Statement*

80.     On November 21, 2022, the Company filed its annual proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Seth, Chell, Nicholson, Shetty, and Steinhart solicited the 2022 Proxy Statement pursuant to Section 14A of the Exchange Act.

81.     The 2022 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendant Shetty to the Board for a three-year term; (2) approve an amendment

28

to the Company's 2019 Incentive Plan; (3) ratify the appointment of Marcum LLP as the Company independent registered public accounting firm for the 2022 Fiscal Year; and (4) approve, on an advisory basis, the compensation of the Company's named executive officers. As disclosed in the 2022 Proxy Statement, approval of the amendment to the 2019 Incentive Plan would make an additional 3,500,000 shares available for grant, for a total of 9,333,333.

82.    The 2022 Proxy Statement noted that approval of the amendment to the 2019 Incentive Plan would be necessary to meet the Company's current and future needs.

83.    The 2022 Proxy Statement opened with a letter to shareholders from Defendant Seth, who stated that the Seirra Trial and forthcoming BLA for Iomab-B were progressing as expected:

> We were thrilled to announce highly positive topline results from the pivotal Phase 3 SIERRA trial for our lead asset Iomab-B last week. The SIERRA trial met its primary endpoint of durable Complete Remission (dCR) of 6 months post-initial remission after a bone marrow transplant (BMT) with high statistical significance (p<0.0001) compared to the control arm. The trial was conducted in patients 55 years of age or older with r/r AML who typically cannot access a potentially lifesaving BMT as they are deemed unfit and thus unable to tolerate standard chemotherapy-based conditioning. Trial results showed that with Iomab-B conditioning, these patients have increased access to a BMT with a clinically meaningful duration of complete remission, along with a favorable safety profile, potentially establishing a new treatment option for the majority of the 10,000 r/r AML patients in the U.S. who are deemed unfit for BMT with current approaches. Driven by strong encouragement from SIERRA trial investigators who represent the leading transplant physicians at the largest volume transplant hospitals, we expect to present detailed SIERRA trial data at upcoming BMT focused medical conference(s). ***We look forward to unveiling this data in a setting that will maximize the impact of our trial results for our target audience of transplant physicians as our team works assiduously toward a Biologics License Application (BLA) filing and Early Access Program in 2023***.
>
> We strongly believe that based on these results and prior clinical data in over 12 trials and several hundred patients in other blood cancers, Iomab-B has the potential to establish a new standard of care and to increase access to BMT with improved patient outcomes not only in AML but in MDS, ALL, Hodgkin's and Non-Hodgkin's Lymphoma and Multiple Myeloma. These results from our well-controlled SIERRA trial will help drive development of the broader opportunity for

the Iomab-B clinical program that includes label expansion and also for Iomab-ACT, a low dose version of the Iomab-B construct that is focused on lymphodepletion and reduced intensity conditioning prior to CAR-T and gene and cellular therapies. We look forward to sharing additional details on our Iomab-B expansion strategy and sharing more on our Iomab-ACT trial with Memorial Sloan Kettering and the broader development program next year. . . .

Our achievements this year provide a stellar foundation upon which we can execute on our corporate strategy as we continue the momentum into 2023. ***We are hyper focused on delivering a successful BLA filing to obtain approval for Iomab-B and building the capabilities for a successful commercial launch.*** We will continue to advance our clinical programs by focusing on the Iomab-B lifecycle management plan, Actimab-A combination trials and Iomab-ACT program in cell and gene therapies. We will continue to advance our R&D programs and partnerships into the next phases of development.

84.      Regarding the Sierra Trial, the 2022 Proxy Statement later stated the following:

With the highly positive topline data in hand and strong investigator support, we look forward to highlighting additional SIERRA data at upcoming BMT focused conferences to convey Iomab-B's value proposition to our target physician community. Our team is hard at work and focused on submitting a BLA in 2023, with the intent of securing what we hope will be the first of many approved indications for Iomab-B. We are also progressing our efforts to initiate an Early Access Program that will broaden the real-world experience with Iomab-B. In 2023, we are excited to build upon the promise of Iomab-B by further developing the lifecycle plan and continue to make progress on Iomab-ACT.

85.      Regarding "Board Leadership Structure and Role in Risk Oversight," the 2022

Proxy Statement stated the following:

Our Board currently consists of five directors, and the positions of Chairman of the Board and principal executive officer are filled by Mr. Sandesh Seth, coupled with a lead independent director position to further strengthen the leadership structure. The Board acknowledges that there are different leadership structures that could allow it to effectively oversee the management of the risks relating to the Company's operations. However, our Board believes that having Mr. Seth as the Chairman of the Board and the Chief Executive Officer provides an efficient and effective leadership model for the Company, as such structure allows our independent directors to share responsibility in leading the Board, while allowing Mr. Seth to focus primarily on managing the operations of Company.

David Nicholson has been serving as our lead independent director (the "Lead Independent Director") since September 2017. Our Lead Independent Director chairs the executive sessions of our Board meetings; provides feedback to the

Chairman and Chief Executive Officer; if appropriate, and in coordination with executive management, is available for consultation and direct communication with major stockholders; and leads the Board's evaluation of the Chairman and Chief Executive Officer. We have a separate chair for each committee of our Board, all of whom are independent directors. The chairs of each committee report on the activities of their committees in fulfilling their responsibilities at the meetings of our Board.

Our Board is responsible for overseeing the Company's risk management processes. The Board receives reports from management concerning the Company's assessment of risks and considers the Company's risk profile. The Board focus on the most significant risks facing the Company and the Company's general risk management strategy. In addition, as part of its oversight of our Company's executive compensation program, the Board considers the impact of such program, and the incentives created by the compensation awards that it administers, on our Company's risk profile. In addition, the Board, based on the Compensation Committee's review of all of our compensation policies and procedures, considers the incentives that they create and factors that may reduce the likelihood of excessive risk taking and determines whether they present a significant risk to our Company. The Board has determined that, for all employees, our compensation programs do not encourage excessive risk and instead encourage behaviors that support sustainable value creation.

86.     Regarding the Code of Conduct, the 2022 Proxy Statement stated the following:

We adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees, including our principal executive officer and principal financial and accounting officer. The Code of Business Conduct and Ethics addresses, among other things, competition and fair dealing, conflicts of interest, protection and proper use of Company assets, government relations, compliance with laws, rules and regulations and the process for reporting violations of the Code of Business Conduct and Ethics, employee misconduct, improper conflicts of interest or other violations. A copy of the Code of Business Conduct and Ethics is available on the Investor section of our website at *www.actiniumpharma.com*. We will post on our website any amendment to our Code of Business Conduct and Ethics or waivers of our Code of Business Conduct and Ethics for directors and executive officers.

Under our Code of Business Conduct and Ethics, no Corporate director, officer or other employee, agent or contractor may, directly or indirectly, sell any equity security, including derivatives, of the Corporation (1) if he or she does not own the security sold, or (2) if he or she owns the security, does not deliver it against such sale (a "short sale against the box") within twenty days thereafter, or does not within five days after such sale deposit it in the mails or other usual channels of transportation. No Corporate director, officer or other employee, agent or contractor may engage in short sales, which are defined as any transactions whereby

one may benefit from a decline in the Corporation's stock price.

87.    Defendants Seth, Chell, Nicholson, Shetty, and Steinhart caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the data the Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

88.    The 2022 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

89.    As a result of Defendants Seth, Chell, Nicholson, Shetty, and Steinhart causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1)

re-elect Defendant Shetty to the Board for a three-year term, thereby allowing him to continue breaching his fiduciary duties to the Company; (2) approve an amendment to the Company's 2019 Incentive Plan; (3) ratify the appointment of Marcum LLP as the Company independent registered public accounting firm for the 2022 Fiscal Year; and (4) approve, on an advisory basis, the compensation of the Company's named executive officers.

90.     As a result of the shareholders approving the Amendment to the 2019 Incentive Plan, there were an additional 3,500,000 shares available for issuance under the Incentive Plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2022 Proxy Statement and the shareholders approving the amendment to the 2019 Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2019 Incentive Plan in the future.

### *December 11, 2022 Press Release*

91.     In addition to giving a presentation at the 64th Annual American Society of Hematology Meeting, the Company issued a press release on December 11, 2022. The press release highlighted OS data from the Sierra Trial, stating, *inter alia*:

> In addition, Iomab-B significantly improved event-free survival, a secondary endpoint, with a hazard ratio of 0.22 and median overall survival (mOS) was doubled.

92.     During the presentation, Defendant Desai, speaking on behalf of the Company, highlighted the Sierra Trial results that showed an increased survival rate across populations and subgroups, stating:

The results also show that on a population basis and across subgroups, an Iomab-B led BMT may result in improved survival. We are incredibly excited for the potential of Iomab-B and what it represents for patients with relapsed or refractory AML.

***January 19, 2023 B. Riley Securities' Conference***

93.     On January 19, 2023, Defendant Seth presented on behalf of the Company at the B. Riley Securities' Annual Oncology Conference. During the presentation, in response to an analyst question requesting a description and highlights from the Sierra Trial, Defendant Seth touted the trial's "pristine" design, as well as acknowledging the FDA's role in the design. Defendant Seth even announced that the FDA designed the Sierra Trial, as opposed to the Company, stating:

> So conceptually, the trial design was very – it's an experiment that really the FDA set up in conjunction with us versus resetting it up in conjunction with the FDA.

***February 18, 2023 Press Release***

94.     On February 18, 2023, the Company issued a press release in which it announced the "positive full data results" from the Sierra Trial. The press release revealed that the Sierra Trial, *inter alia*, met its primary endpoint, stating:

> (Actinium or the Company), a leader in the development of targeted radiotherapies, today announced positive results for the primary and secondary endpoints from its pivotal Phase 3 SIERRA trial of Iomab-B in patients age 55 and above with active relapsed or refractory acute myeloid leukemia (r/r AML). ***Iomab-B met the primary endpoint of durable Complete Remission (dCR) of 6-months following initial complete remission following BMT with a high degree of statistical significance (p<0.0001). Additionally, Iomab-B produced a significant and clinically meaningful improvement in the secondary endpoint of Event-Free Survival (EFS), with a 78% reduction in the probability of an event (Hazard Ratio=0.22, p<0.0001).*** Iomab-B doubled 1-year survival compared to the control arm excluding cross over patients (26.1% vs 13.1%) as well as median overall survival (6.4 months vs. 3.2 months). Iomab-B was well tolerated with four times lower rates of sepsis (6.1% vs 28.6%) and lower rates of febrile neutropenia, mucositis and acute graph versus host disease (aGVHD). Iomab-B enabled unprecedented access to BMT with 100% engraftment in patients receiving a therapeutic dose of Iomab-B compared to 18% of patients in the control arm and

Iomab-B produced a 75% post-BMT Complete Remission (CR) rate compared to 6.3% post-BMT CR in the control arm. These high rates of access and post-BMT CR enabled the highly significant primary endpoint results. The full SIERRA results were presented in the late-breaker session at the 2023 Tandem Meetings: Transplantation & Cellular Therapy Meetings of the American Society for Transplantation and Cellular Therapy (ASTCT) and the Center for International Blood & Marrow Transplant Research (CIBMTR).

95.     The press release also quoted Defendant Giralt in discussing the results, stating:

The SIERRA trial results are an exciting advancement for older patients with active r/r AML and will be practice changing in how we treat these patients. I am thrilled to see a high percentage of Iomab-B patients who achieved durable remissions reaching the critical 2-year survival mark. Significant improvement in event-free survival and overall survival, with an excellent safety profile in the SIERRA trial, demonstrate the potential of Iomab-B becoming a new standard of care for active, r/r AML.

*February 18, 2023 Conference Call*

96.     That same day, the Company hosted a special call with investors and analysts to discuss the Company's upcoming release of the Sierra Trial results.

97.     During the question-and-answer portion of the call, Defendant Vusirikala discussed the FDA's guidance of the Sierra Trial, stating:

So this trial was designed as a pristine experiment to demonstrate the effect of Iomab versus conventional care in guidance with the FDA. So under this guidance, maintenance was highly restricted on the Iomab-B arm.

*February 27, 2023 Press Release*

98.     On February 27, 2023, the Company issued a press release announcing that the following day (February 28, 2023), there would be a key opinion leader webinar hosted by Defendant Giralt to discuss "the results from the recently completed pivotal Phase 3 SIERRA trial of Iomab-B, which were presented in a late-breaker presentation at the Transplantation & Cellular Therapy (TCT) tandem meetings on February 18, 2023."

99.     The press release also quoted Defendant Seth, who said of the webinar:

We are honored that Dr. Giralt, who is instrumental in advancing the field of bone marrow transplant, will present the SIERRA data and frame how Iomab-B can address the unmet need for the majority of r/r AML patients who are not transplantable today. We are excited to move ahead with the BLA filing of Iomab-B in 2H:2023 following the highly positive, full results from the SIERRA trial which clearly established Iomab-B's ability to provide unprecedented access to a BMT to patients who currently not transplantable and to meaningfully improve outcomes.

***February 28, 2023 Key Opinion Leader Webinar***

100.    On February 28, 2023, the Company hosted the webinar with investors and analysts, providing a presentation of the Sierra Trial's full results.

101.    During his scripted remarks on the call, Defendant Giralt stated the FDA had required DCR as a primary endpoint for the Sierra Trial. Defendant Giralt stated, *inter alia*:

Sierra met the primary end point of durable complete remission greater or equal to 100 (sic) [180] days, with high statistical significance. Durable complete remission is a very appropriate end point in the study and actually was designed and required by FDA guidance. Company intends to file a BLA for Iomab-B in the second quarter – or the second half of 2023. Company plans to launch an early access program to make Iomab-B available prior to potential approval.

102.    Later on the call, during the question-and-answer portion, an analyst asked a question regarding the DCR endpoint, questioning what the Company had seen in ""trends on the survival, in terms of approvability by FDA," and how those trends looked compared to what has already been "approved for targeted therapies in relapsed/refractory settings." Defendant Giralt responded:

Complete remission is the single most important surrogate for not only long-term disease control but overall survival. Now mind you: If you think about all of the targeted therapies, those complete remission rates fall somewhere between 30% to 40%. Now unfortunately many of the patients who receive targeted therapy, even if they achieve a complete remission, end up relapsing very early on. As you can see in the control group in Sierra, very few people actually had – none of them had remissions that lasted more than 6 months. In the Iomab-B group, there was 22% of the patients achieved a complete remission that lasted more than – I mean 30% of the patients achieved a complete remission that lasted more than 6 months. And when you add the crossover group and you look at all those patients who achieved

that durable complete remission and see what happened to them 2 years later, 2/3 of those patients are still in complete remission. So I think, one, this is clinically relevant end point, a very good clinical significance and clinical benefit. Now can we work upon that? Can we make it better? As I said in my talk, I think we can definitely make it better by adding post-transplant therapies that the protocol did not allow. So I definitely think this is a very important primary end point of clinical significance and clinical benefit for these patients.

103.    In response to another analyst's question, asking, in regards to how one would design a "Phase 3 III trial of Iomab-B in AML bone marrow transplant study, how do you design it to show the benefit more clearly?" In response, Defendant Giralt stated:

[L]et me tell you that the study was designed together with the FDA. And the reality is, when you ask me, "How would you design it?" I'll design it whichever way the FDA wants me to design it to get the drug approved. So that's how it was designed.

***March 10, 2023 Form 10-K***

104.    On March 10, 2023, the Company filed its annual report on Form 10-K for the 2022 Fiscal Year with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Seth, O'Loughlin, Chell, Nicholson, Shetty, and Steinhart and attached SOX certifications signed by Defendants Seth and O'Loughlin attesting to the accuracy of the 2022 10-K.

105.    In discussing the Company's progress regarding a BLA for Iomab-B, the 2022 10-K stated, in relevant part:

On October 31, 2022, we announced topline results from the pivotal Phase 3 Study of Iomab-B in Elderly Relapsed or Refractory AML or SIERRA trial, which demonstrated that Iomab-B met the primary endpoint of durable Complete Remission ("dCR") with a high degree of statistical significance (p<0.0001). On February 18, 2023, we announced full trial results, demonstrating unprecedented access, improved outcomes and better safety and tolerability with double 1-year and median overall survival ("OS") compared to control arm patients receiving Iomab-B at the 2023 Tandem Meetings aka the Transplantation & Cellular Therapy Meetings of the American Society for Transplantation and Cellular Therapy ("ASTCT") and the Center for International Blood & Marrow Transplant Research ("CIBMTR"). We believe these results provide the opportunity to establish Iomab-B as a new standard of care, and if approved, we intend to commercialize the product in the United States ("U.S.").

* * *

We are actively working on launching an early access program ("EAP") for Iomab-B and intend to file a Biologics License Application ("BLA") by year-end while preparing for a U.S. commercial launch and working with our partner Immedica to support the Marketing Authorization Application ("MAA") and commercialization in the EU.

106.    The 2022 10-K later reiterated the Company's intent to file its BLA, stating:

We intend to file a BLA in the second half of 2023 based on the strong results from the Pivotal Phase 3 SIERRA trial and leverage our proven operating track record at key cancer centers to build a high impact organization that can effectively commercialize Iomab-B. By virtue of the SIERRA trial, we have established operations at 24 leading BMT centers that represent about 30% of transplant volume in the U.S. and have strong working partnership with Key Opinion Leaders and their teams. The positive SIERRA results demonstrating unprecedented access to BMT and outcomes along with our commitment to operational excellence provides a strong foundation for our commercial team in the U.S. We will also work with our partner Immedica to file the MAA for the EU and support Iomab-B's potential approval and launch with our expertise, as well as supply drug product for commercialization.

107.    In discussing the Company's pipeline of clinical trials, the 2022 10-K listed a number of the Company's products, but nothing for Iomab-B, stating:

In December 2015, the FDA cleared our IND filing for Iomab-B and we have completed patient enrollment of a randomized, controlled, pivotal Phase 3 clinical trial under such IND to study Iomab-B in patients 55 years of age or older with relapsed or refractory AML. The Phase 3 SIERRA trial met its primary endpoint with high statistical significance with positive results for secondary endpoints and exploratory endpoints and it is expected to form the basis for a BLA for Iomab-B for use in preparing and conditioning AML patients for a BMT. . . . Except for Iomab-B (for patients with AML), we expect that the clinical trials we need to conduct to be in a position to submit BLAs for our product candidates currently in-development will take, at least, several years to complete.

108.    In discussing the involvement of the FDA in the development of the Sierra Trial, the 2022 10-K stated:

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, Actimab-A, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any

product candidate we advance into clinical trials may not have favorable results in later clinical trials. We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA.

### *May 15, 2023 Form 10-Q*

109.    On May 15, 2023, the Company filed its quarterly report on Form 10-Q (the "Q1 2023 10-Q") for the first quarter of the fiscal year ended December 31, 2023 ("2023 Fiscal Year") with the SEC. The Q1 2023 10-Q was signed by Defendants Seth and O'Loughlin and attached SOX certifications signed by Defendants Seth and O'Loughlin attesting to the accuracy of the Q1 2023 10-Q.

110.    In discussing the results of the Sierra Trial and the Company's intent to file a BLA, the Q1 2023 10-Q stated:

We announced in October 2022 that Iomab-B met the primary endpoint of durable Complete Remission ("dCR") with a high degree of statistical significance (p<0.0001) in the pivotal Phase 3 Study of Iomab-B in Elderly Relapsed or Refractor AML, or "SIERRA trial." In February 2023, we announced full trial results, demonstrating unprecedented transplant access and improved outcomes in patients with relapsed/refractory AML, with double 1-year and median overall survival ("OS") compared to control arm patients. These data were presented at the 2023 Tandem Meetings aka the Transplantation & Cellular Therapy Meetings of the American Society for Transplantation and Cellular Therapy ("ASTCT") and the Center for International Blood & Marrow Transplant Research ("CIBMTR"). We believe these results from the SIERRA trial may provide the opportunity, if we are able to obtain FDA approval, to establish Iomab-B as a new standard of care.

The results from the SIERRA trial were recently presented and discussed at major oncology medical and nursing congresses, which is helping to broaden the awareness of Iomab-B among members of the relevant medical and scientific communities as we prepare for potential commercialization if we achieve FDA approval. On April 27, 2023, the results from the SIERRA trial were also showcased at the European Society for Blood and Marrow Transplantation ("EBMT") 49th Annual Meeting, which is well-attended by the European transplant community. On April 28, 2023, we announced that two posters that detailed clinical findings from the SIERRA trial sites were presented at the 48th Annual Oncology Nursing Society ("ONS") Congress. We believe that the scientific community present at such events took note of the successful

administration of Iomab-B infusions at various BMT centers, which was done without increasing radiation exposure risks to treating nursing staff. On May 11, 2023, we announced that these results were also accepted for oral presentation at the European Hematology Association ("EHA") 2023 Hybrid Congress to be held in Frankfurt, Germany on June 8-11, 2023.

***We are working towards completing and submitting our Biologics License Application ("BLA") for Iomab-B to the U.S. Food and Drug Administration ("FDA") in the second half of 2023 and if approved, we intend to commercialize Iomab-B in the U.S.***

111.    In discussing the Company's progress towards a BLA, the Q1 2023 10-Q stated the following:

We intend to file a BLA in the second half of 2023 based on the positive results from the Pivotal Phase 3 SIERRA trial and leverage our operating track record at key cancer centers to build an organization that can effectively commercialize Iomab-B. By virtue of the SIERRA trial, we have established operations at 24 leading BMT centers that represent about 30% of transplant volume in the U.S. and have strong working partnership with Key Opinion Leaders and their teams. The SIERRA results demonstrating unprecedented access to BMT and outcomes along with our commitment to operational excellence provides a strong foundation for our commercial team in the U.S. We will also work with our partner Immedica to file the MAA for the EU and support Iomab-B's potential approval and launch with our expertise, as well as supply drug product for commercialization.

112.    In discussing the impact the results of the Sierra Trial had on the BLA, the Q1 2023 10-Q stated:

The results of the Pivotal Phase 3 SIERRA trial validate the value proposition of Iomab-B, and we believe it could establish unprecedented access to transplant (currently the only curative option) with better safety and tolerability and improved outcomes, all of which could potentially make Iomab-B the new standard of care for patients with r/r AML. We are actively working to launch an EAP and successfully file a BLA in the second half of 2023, and if approved, we anticipate the commercial launch for Iomab-B in 2024.

113.    In discussing the input the FDA had in the Sierra Trial, the Q1 2023 10-Q stated:

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, CD33 program candidates, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have

favorable results in later clinical trials. ***We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA, pending results from the trial***.

### November 2, 2023 Form 10-Q

114.    On November 2, 2023, the Company filed its quarterly report on Form 10-Q for the third quarter of the 2023 Fiscal Year with the SEC (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendants Seth and O'Loughlin and attached SOX certifications signed by Defendants Seth and O'Loughlin attesting to the accuracy of the Q3 2023 10-Q.

115.    In discussing the timeline of the Company's BLA for Iomab-B, the Q3 2023 10-Q revealed the BLA would not be filed in 2023. The Q3 2023 10-Q revealed that despite this, the BLA was still on track and the Company was actively coordinating with the FDA, stating:

> We are working towards completing and submitting our Biologics License Application ("BLA") for Iomab-B to the FDA, and if approved, we intend to commercialize Iomab-B in the U.S. We have been meeting with the FDA regarding our BLA strategies, and have received positive feedback regarding the Chemistry, Manufacturing and Controls ("CMC") package for Iomab-B. The Company, as a continuation of our regulatory interactions with the FDA, will request a meeting prior to completion of the CMC package to further discuss the clinical and non-clinical modules that will determine the finalization and timing of our planned BLA filing. As a result of the CMC meeting, as well as updated project timelines necessitated by the now complete facility modifications at one of our third-party manufacturers, the Company is progressing with completion of CMC activities and believes it is on track to complete the CMC modules and be in a position to submit a BLA filing in the first half of 2024.

116.    The Q3 2023 10-Q further reiterated the Company's intent to file a BLA, stating:

> We intend to file a BLA in the first half of 2024 based on the positive results from the Pivotal Phase 3 SIERRA trial and successful regulatory interactions with the FDA. We intend to leverage our operating track record at key cancer centers to build an organization that can effectively commercialize Iomab-B. By virtue of the SIERRA trial, we have established operations at 24 leading BMT centers in the U.S (22) and Canada (2) that represent about 30% of transplant volume and have strong working partnership with Key Opinion Leaders ("KOLs") and their teams. The SIERRA results demonstrating unprecedented access to BMT and outcomes along

with our commitment to operational excellence provides a strong foundation for our commercial team in the U.S.

117.    In discussing the FDA's involvement with the Sierra Trial, the Q3 2023 10-Q stated:

> Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, Actimab-A, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have favorable results in later clinical trials. We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA.

***November 2, 2023 Press Release***

118.    On November 2, 2023, the Company issued a press release announcing that it would be presenting an oral presentation at the 65th Annual American Society of Hematology Meeting on December 10, 2023. The Press Release revealed that the presentation would be highlighting the results of the Sierra Trial and Iomab-B. The press release also revealed that "[o]utcomes of patients with a TP53 gene mutation enrolled in the SIERRA trial have been accepted for an oral presentation."

119.    The press release also quoted Defendant Desai as stating:

> We are very excited by these results which show a statistically significant and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B. These results further support Iomab-B's differentiated profile and ability to improve outcomes for the most difficult to treat r/r AML patients. A TP53 gene mutation is arguably the most unfavorable risk factor leading to the worst patient outcomes as it is associated with inherent resistance to available therapies, short duration of responses and the lowest survival rates.

***2023 Proxy Statement***

120.    On November 9, 2023, the Company filed its annual proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Seth, Chell, Nicholson, Shetty, and

Steinhart solicited the 2023 Proxy Statement pursuant to Section 14A of the Exchange Act.

121.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Nicholson and Steinhart to the Board for a three-year term; and (2) ratify the appointment of Marcum LLP as the Company independent registered public accounting firm for the 2023 Fiscal Year.

122.    Regarding "Board Leadership Structure and Role in Risk Oversight," the 2023 Proxy Statement stated the following:

> Our Board currently consists of five directors, and the positions of Chairman of the Board and principal executive officer are filled by Mr. Sandesh Seth, coupled with a lead independent director position to further strengthen the leadership structure. The Board acknowledges that there are different leadership structures that could allow it to effectively oversee the management of the risks relating to the Company's operations. However, our Board believes that having Mr. Seth as the Chairman of the Board and the Chief Executive Officer provides an efficient and effective leadership model for the Company, as such structure allows our independent directors to share responsibility in leading the Board, while allowing Mr. Seth to focus primarily on managing the operations of Company.

> David Nicholson has been serving as our lead independent director (the "Lead Independent Director") since September 2017. Our Lead Independent Director chairs the executive sessions of our Board meetings; provides feedback to the Chairman and Chief Executive Officer; if appropriate, and in coordination with executive management, is available for consultation and direct communication with major stockholders; and leads the Board's evaluation of the Chairman and Chief Executive Officer. We have a separate chair for each committee of our Board, all of whom are independent directors. The chairs of each committee report on the activities of their committees in fulfilling their responsibilities at the meetings of our Board.

> Our Board is responsible for overseeing the Company's risk management processes. The Board receives reports from management concerning the Company's assessment of risks and considers the Company's risk profile. The Board focus on the most significant risks facing the Company and the Company's general risk management strategy. In addition, as part of its oversight of our Company's executive compensation program, the Board considers the impact of such program, and the incentives created by the compensation awards that it administers, on our Company's risk profile. In addition, the Board, based on the Compensation Committee's review of all of our compensation policies and procedures, considers the incentives that they create and factors that may reduce

43

the likelihood of excessive risk taking and determines whether they present a significant risk to our Company. The Board has determined that, for all employees, our compensation programs do not encourage excessive risk and instead encourage behaviors that support sustainable value creation.

123.    Regarding the Code of Conduct, the 2023 Proxy Statement stated the following:

We adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees, including our principal executive officer and principal financial and accounting officer. The Code of Business Conduct and Ethics addresses, among other things, competition and fair dealing, conflicts of interest, protection and proper use of Company assets, government relations, compliance with laws, rules and regulations and the process for reporting violations of the Code of Business Conduct and Ethics, employee misconduct, improper conflicts of interest or other violations. A copy of the Code of Business Conduct and Ethics is available on the Investor section of our website at *www.actiniumpharma.com*. We will post on our website any amendment to our Code of Business Conduct and Ethics or waivers of our Code of Business Conduct and Ethics for directors and executive officers.

Under our Code of Business Conduct and Ethics, no director, officer or other employee, agent or contractor of the Company may, directly or indirectly, sell any equity security, including derivatives, of the Company (1) if he or she does not own the security sold, or (2) if he or she owns the security, does not deliver it against such sale (a "short sale against the box") within twenty days thereafter, or does not within five days after such sale deposit it in the mails or other usual channels of transportation. No director, officer or other employee, agent or contractor of the Company may engage in short sales, which are defined as any transactions whereby one may benefit from a decline in the Company's stock price. Our directors, officers and employees are also prohibited from trading in our securities during certain designated blackout periods and otherwise while they are aware of material non-public information.

124.    Defendants Seth, Chell, Nicholson, Shetty, and Steinhart caused the 2023 Proxy

Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the data the

Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for

acceptance of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the

Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were

likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for

Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-

B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

125.    The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

126.    As a result of Defendants Seth, Chell, Nicholson, Shetty, and Steinhart causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Nicholson and Steinhart to the Board for a three-year term, thereby allowing him to continue breaching his fiduciary duties to the Company; and (2) ratify the appointment of Marcum LLP as the Company independent registered public accounting firm for the 2023 Fiscal Year.

### December 11, 2023 Press Release

127.    On December 11, 2023, the Company issued a press release discussing the Company's presentation at the 65th Annual American Society of Hematology Meeting & Exposition. The press release highlighted Iomab-B's "high response rates and significant

improvement in overall survivor" in R/R patients.

128.    In discussing the Sierra Trial, the press release stated:

Iomab-B is a targeted radiotherapeutic comprised of an anti-CD45 monoclonal antibody with the Iodine-131 radioisotope payload. The Phase 3 SIERRA trial enrolled 153 patients with active relapsed or refractory acute myeloid leukemia (AML) and compared outcomes of patients receiving Iomab-B and a bone marrow transplant (BMT) to those of patients receiving physician's choice of care in the control arm, which was intended to reflect current best practices. Patients not achieving a Complete Remission (CR) in the control arm who were unable to proceed to a BMT were offered to crossover to receive an Iomab-B led BMT.

Iomab-B achieved the primary endpoint in the SIERRA trial of durable Complete Remission (dCR) of at least 6 months with high statistical significance (p<0.0001), with 22% of patients randomized to the Iomab-B arm achieving dCR and 0% of patients in the control arm achieving dCR, irrespective of TP53 mutational status. *In addition, Iomab-B significantly improved event-free survival, a secondary endpoint, with a hazard ratio of 0.22 and median overall survival (mOS) was doubled.*

129.    The press release also quoted Defendant Desai in discussing the results of the

Sierra Trial, stating:

The SIERRA trial data support that regardless of advanced age, prior therapy, or high-risk cytogenetics including a TP53 mutation, Iomab-B provides unprecedented access to a potentially curative BMT. The results also show that on a population basis and across subgroups, an Iomab-B led BMT may result in improved survival. We are incredibly excited for the potential of Iomab-B and what it represents for patients with relapsed or refractory AML.

***March 29, 2024 Form 10-K***

130.    On March 29, 2024, the Company filed its annual report on Form 10-K for the

2023 Fiscal Year with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Seth,

O'Loughlin, Chell, Nicholson, Shetty, and Steinhart and attached SOX certifications signed by

Defendants Seth and O'Loughlin attesting to the accuracy of the 2023 10-K.

131.    In discussing the progress towards the BLA for Iomab-B, the 2023 10-K stated:

We continue to advance our efforts to file our Biologics License Application ("BLA") for Iomab-B to the FDA. . . .We conducted a successful meeting with the

FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls ("CMC") package for Iomab-B and have been assigned a BLA number. We have also submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package prior to submitting our BLA filing and expect to hold this meeting in the second quarter of 2024. . . .Based on our current assumptions, we believe we may be able to receive regulatory approval for Iomab-B in 2025.

132.    In discussing the Sierra Trial, the 2023 10-K stated:

In December 2015, the FDA cleared our IND filing for Iomab-B and we have completed patient enrollment of a randomized, controlled, pivotal Phase 3 clinical trial under such IND to study Iomab-B in patients 55 years of age or older with relapsed or refractory AML. The Phase 3 SIERRA trial met its primary endpoint with high statistical significance with positive results for secondary endpoints and exploratory endpoints and it is expected to form the basis for a BLA for Iomab-B for use in preparing and conditioning AML patients for a BMT.

133.    In discussing the FDA's involvement with the Sierra Trial, the 2023 10-K stated:

We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA.

***April 26, 2024 Form 10-Q***

134.    On April 26, 2024, the Company filed its quarterly report on Form 10-Q (the "Q1 2024 10-Q") for the first quarter of the fiscal year ended December 31, 2024 ("2024 Fiscal Year") with the SEC. The Q1 2024 10-Q was signed by Defendants Seth and O'Loughlin and attached SOX certifications signed by Defendants Seth and O'Loughlin attesting to the accuracy of the Q1 2024 10-Q.

135.    In discussing the Company's progress towards a BLA filing for Iomab-B, the Q1 2024 10-Q stated:

We continue to advance our efforts to file our Biologics License Application ("BLA") for Iomab-B to the FDA and support Immedica, our EUMENA commercial partner, with the MAA for Iomab-B with the European Medicines Agency ("EMA"). We conducted a successful meeting with the FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls

("CMC") package for Iomab-B and have been assigned a BLA number. We have also submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package prior to submitting our BLA filing and we continue to expect to hold this meeting in the second quarter of 2024.

136.    In discussing the status of the Sierra Trial, the Q1 2024 10-Q stated:

We have completed patient enrollment in the pivotal Phase 3 SIERRA trial (Study of Iomab-B in Elderly Relapsed or Refractory AML), a 153-patient multi-center randomized trial that compared outcomes of patients who receive Iomab-B and a BMT to those of patients receiving physician's choice of salvage chemotherapy, defined as conventional care, as no standard of care exists for this patient population. We have announced that Iomab-B met the primary endpoint of dCR in the SIERRA trial with statistical significance (p<0.0001) and we intend to submit a BLA with the FDA in 2024.

137.    In discussing the FDA's involvement with the Sierra Trial, the Q1 2024 10-Q stated:

We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA.

138.    The statements in ¶¶71-79, 91-119, and 127-137 were materially false and misleading because they failed to disclose, *inter alia*, that:  (1) the data the Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public

statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

139.    The truth did not fully emerge until August 2, 2024, when the Company issued a press release announcing that the Company had concluded its clinical and Chemistry, Manufacturing, and Controls interactions with the FDA.

140.    The press release further revealed that the despite the Sierra Trial having met its primary endpoint, the FDA would be requiring an OS benefit trial in advance of the BLA filing. The press release went on to explain:

> Despite the Sierra trial meeting the primary endpoint of durable Complete Remission ("DCR") with statistical significance (p-value<0.0001) and other positive secondary endpoints including Event Free Survival ("EFS") and safety, the FDA has now determined that demonstrating an overall survival benefit in a randomized head-to-head trial is required for a BLA filing. The FDA has advised Actinium to conduct a study to evaluate allogeneic bone marrow transplant (BMT) using Iomab-B plus a reduced intensity conditioning regimen of fludarabine and total body irradiation ("Flu/TBI") versus allogeneic BMT using reduced intensity conditioning comprised of cyclophosphamide plus Flu/TBI, a difference from the Sierra trial, which had allowed physician's choice of salvage therapies and heterogenous conditioning regimens in the control arm. Additionally, the proposed new study will not allow patients to crossover from the control arm which was allowed in the Sierra trial and confounded the overall survival analysis in the intent to treat ("ITT") patient population, as nearly 60% of patients crossed over from the control arm.

> * * *

> . . . [S]everal additional analyses from the Sierra study to the FDA including longterm follow-up that demonstrated a trend towards improved overall survival and evidence of survival benefit in patients with high-risk TP53 mutations to support Iomab-B's impact on overall survival . . . However, the FDA has now determined that the analyses from the Sierra trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study.

141.    That same day, the Company also filed its quarterly report on Form 10-Q for the second quarter of the 2024 Fiscal Year with the SEC (the "Q2 2024 10-Q"). The Q2 2024 10-Q

reiterated the FDA's request that further trials be performed prior to approving a BLA for Iomab-B, stating:

> Actinium has now concluded both its clinical and Chemistry, Manufacturing and Controls ("CMC") interactions with the FDA regarding the BLA pathway for Iomab-B based on the positive SIERRA trial results. As previously disclosed, we received positive feedback from the FDA regarding our CMC package for Iomab-B and were also assigned a BLA number. However, the FDA has now provided definitive feedback regarding the clinical portion that the SIERRA trial alone is not adequate to support a BLA filing for Iomab-B despite the SIERRA trial meeting the primary endpoint of durable Complete Remission (dCR) with statistical significance (p-value<0.0001) and other positive secondary endpoints including Event Free Survival ("EFS") and safety. The FDA now requires that demonstrating an overall survival benefit in a randomized head-to-head trial is necessary and has advised us to conduct a study to evaluate allogeneic bone marrow transplant ("BMT") using Iomab-B plus a reduced intensity conditioning regimen of fludarabine and total body irradiation ("Flu/TBI") versus allogeneic BMT using reduced intensity conditioning comprised of cyclophosphamide plus Flu/TBI. This proposed additional study will differ from the SIERRA trial, which allowed physician's choice of salvage chemotherapies and heterogenous conditioning regimens in the control arm. Additionally, the proposed new study will not allow patients to cross over from the control arm, which was allowed in the SIERRA trial and confounded the overall survival analysis in the intent to treat ("ITT") patient population, as nearly 60% of patients crossed over from the control arm.

> The Phase 3 SIERRA trial enrolled 153 patients with r/r AML and compared outcomes of patients receiving Iomab-B and a BMT for patients receiving physician's choice of care with salvage chemotherapies and standard allogeneic BMT in the control arm. In February 2023, Actinium announced that the SIERRA trial met the primary endpoint with statistical significance, as 22% of patients (13/76) on the Iomab-B arm achieved dCR compared to 0% of patients (0/77) on the control arm resulting in a p-value of <0.0001. The SIERRA trial was conducted in accordance with guidance from the End of Phase 2 meeting with the FDA, which stated that positive results for dCR as the primary endpoint would be an acceptable endpoint to support an Iomab-B BLA filing. SIERRA did not meet the secondary endpoint of OS on an ITT basis. Over the last several years, a majority of therapies for patients with AML have been approved based on the overall survival endpoint.

> We presented several additional analyses from the SIERRA study to the FDA including long-term follow-up demonstrating a trend towards improved overall survival and evidence of survival benefit in patients with high-risk TP53 mutations to support Iomab-B's impact on overall survival. The SIERRA data were presented in 12 oral presentations at several leading BMT, hematology and nuclear medicine conferences in both the U.S. and Europe, which we believe demonstrates the high unmet medical need and scientific importance of Iomab-B's ability to provide

improved access and outcomes for patients with active r/r AML to the transplant community. However, the FDA has now determined that the analyses from the SIERRA trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study. We expect the safety and efficacy data from the SIERRA trial will provide supportive evidence for a future Iomab-B BLA filing.

142.    On this news, the price of the Company's stock fell $3.69 per share, or approximately 60%, from a close of $6.17 per share on August 2, 2024, to close at $2.48 per share on August 5, 2024.

## DAMAGES TO ACTINIUM

143.    As a direct and proximate result of the Individual Defendants' conduct, Actinium will lose and expend many millions of dollars.

144.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO; its CMO; its VP, Clinical Development BMT and Cellular Therapy; and its Scientific Advisory Board member, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

146.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

147.    Additionally, these expenditures include, but are not limited to, excessive

compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including payments made pursuant to the 2019 ICP as a result of shareholders approving the amendment discussed herein.

148.    As a direct and proximate result of the Individual Defendants' conduct, Actinium has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

149.    Plaintiff brings this action derivatively and for the benefit of Actinium to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Actinium, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

150.    Actinium is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

151.    Plaintiff is, and has been at all relevant times, a shareholder of Actinium. Plaintiff will adequately and fairly represent the interests of Actinium in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    A pre-suit demand on the Board is futile and, therefore, excused. When this action

was filed, Actinium's Board consisted of the following six individuals: Defendants Seth, Chell, Nicholson, Shetty, and Steinhart (the "Director-Defendants"), and non-party June Almenoff (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six Directors that were on the Board at the time this action was filed.

154.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

155.    The Director-Defendants solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendant Shetty to the Board, thus allowing him to continue breaching his fiduciary duties to Actinium.

156.    In addition, the Director-Defendants caused the 2022 Proxy Statement to call for a shareholder vote to approve an amendment to the 2019 Incentive Plan, which increased the amount of shares available under the Incentive Plan by 3,500,000. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the amendment to the 2019 Incentive Plan who would not have approved the amendment to the 2019 Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the amendment to the 2019 Incentive Plan at the annual meeting of stockholders of Actinium on December 8, 2022, 5,833,333 shares were authorized for issuance under the 2019

53

Incentive Plan. After the shareholders approved the amendment to the 2019 Incentive Plan, there were an additional 3,500,000 shares available for issuance under the amended 2019 Incentive Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2022 Proxy Statement and the shareholders approving the 1mendment to the 2019 Incentive Plan that increased the number of shares available under the 2019 Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

157.    The Director-Defendants solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Nicholson and Steinhart to the Board, thus allowing them to continue breaching his fiduciary duties to Actinium.

158.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Actinium to issue materially false and misleading statements. Specifically, the Director-Defendants caused Actinium to issue false and misleading statements which indicated the Company would be able to file a successful BLA for Iomab-B. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

159.    Additional reasons that demand on Defendant Seth is futile to follow. Defendant Seth has served as the Company's CEO since June 2017. He has also served as a Company director since March 2012, and as Chairman of the Company's Board since October 2013. Previously, he also served as the Company's Executive Chairman from August 2014 until June 2017. The

Company provides Defendant Seth with his principal occupation, for which he receives handsome compensation for his role at the Company. Thus, as the Company admits, Defendant Seth is not an independent director. As the trusted CEO, Defendant Seth conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. As CEO, Defendant Seth also personally signed all of the false and misleading 10-Qs and 10-Ks during the Relevant Period. He is also a defendant in the Securities Class Action. Moreover, under the amendment to the 2019 Incentive Plan, Defendant Seth is eligible to receive stock awards under the amendment to the 2019 Incentive Plan, thereby materially benefiting from the adoption of the amendment to the 2019 Incentive Plan.  For these reasons, too, Defendant Seth faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Chell is futile to follow. Defendant Chell has served as a Company director since April 2018. He also serves as a member of the Audit Committee, and the Compensation Committee. Defendant Chell has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Chell also personally signed the false and misleading 2022 and 2023 10-Ks. Moreover, under the amendment to the 2019 Incentive Plan,

Defendant Chell is eligible to receive stock awards under the amendment to the 2019 Incentive Plan, thereby materially benefiting from the adoption of the amendment to the 2019 Incentive Plan. For these reasons, too, Defendant Chell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Nicholson is futile to follow. Defendant Nicholson has served as a Company director since 2008. He also serves as the Lead Independent Director and as the Chair of the Compensation Committee. Defendant Nicholson has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Nicholson also personally signed the false and misleading 2022 and 2023 10-Ks. Moreover, under the amendment to the 2019 Incentive Plan, Defendant Nicholson is eligible to receive stock awards under the amendment to the 2019 Incentive Plan, thereby materially benefiting from the adoption of the amendment to the 2019 Incentive Plan.  For these reasons, too, Defendant Nicholson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Shetty is futile to follow. Defendant Shetty has served as a Company director since March 2017. He also serves as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee and the Compensation Committee. Defendant Shetty has received and continues to receive handsome

compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Shetty also personally signed the false and misleading 2022 and 2023 10-Ks. Moreover, under the amendment to the 2019 Incentive Plan, Defendant Shetty is eligible to receive stock awards under the amendment to the 2019 Incentive Plan, thereby materially benefiting from the adoption of the amendment to the 2019 Incentive Plan. For these reasons, too, Defendant Shetty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Steinhart is futile to follow. Defendant Steinhart has served as a Company director since November 2013. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Steinhart has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a director, Defendant Steinhart also personally signed the false and misleading 2022 and 2023 10-Ks. Moreover, under the amendment to the 2019 Incentive Plan, Defendant Steinhart is eligible to receive stock awards under the amendment to the 2019 Incentive Plan, thereby materially benefiting from the adoption of the amendment to the 2019 Incentive Plan. For these reasons, too,

Defendant Steinhart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    Defendant Steinhart (as Chair), Chell, and Shetty (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

166.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report

known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

167.    Actinium has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Actinium any part of the damages Actinium suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

168.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

169.    The acts complained of herein constitute violations of fiduciary duties owed by Actinium's officers and directors, and these acts are incapable of ratification.

170.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Actinium. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Actinium, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

171.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Actinium to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

172.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>FIRST CLAIM</u>
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

173.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

175.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. § 240.14a-9.

176.    Under the direction and watch of Defendants Seth, Chell, Nicholson, Shetty, and Steinhart, the 2022 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement’s descriptions of the Board’s and its committees’ risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

177.    The 2022 Proxy Statement also failed to disclose that: (1) the data the Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company’s public

statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

178.    In exercise of reasonable care, Defendants Seth, Chell, Nicholson, Shetty, and Steinhart should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to the re-election of Defendant Shetty to the Board and the approval of the amendment to the 2019 Incentive Plan.

179.    The false and misleading elements of the 2022 Proxy Statement led to, among other things, the re-election of Defendant Shetty to the Board for a three-year term, which allowed him to continue to breach his fiduciary duties to the Company, and the approval of the amendment to the 2019 Incentive Plan.

180.    The Company was damaged as a result of Defendants Seth's, Chell's, Nicholson's, Shetty's, and Steinhart's material misrepresentations and omissions in the 2022 Proxy Statement.

181.    Under the direction and watch of Defendants Seth, Chell, Nicholson, Shetty, and Steinhart, the 2023 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

182.    The 2023 Proxy Statement also failed to disclose that: (1) the data the Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for acceptance

of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

183.    In exercise of reasonable care, Defendants Seth, Chell, Nicholson, Shetty, and Steinhart should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to the re-election of Defendants Nicholson and Steinhart to the Board.

184.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the re-election of Defendants Nicholson and Steinhart to the Board for a three-year term, which allowed them to continue to breach their fiduciary duties to the Company.

185.    The Company was damaged as a result of Defendants Seth's, Chell's, Nicholson's, Shetty's, and Steinhart's material misrepresentations and omissions in the 2023 Proxy Statement.

186.    Plaintiff, on behalf of Actinium, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Actinium's business and affairs.

189.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

190.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Actinium.

191.    In breach of their fiduciary duties owed to Actinium, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the data the Company collected in the Sierra Trial would unlikely be sufficient to meet FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (2) the additional analyses performed by the Company, including long-term follow-ups, to mitigate poor OS data during the Sierra Trial were likely insufficient to meet the FDA requirements for acceptance of, and approval for, a BLA for Iomab-B; (3) as a result of the foregoing, the FDA would either refuse to review a BLA for Iomab-B or reject a BLA if the FDA were to consider it; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2019 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public

statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

192.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

193.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

194.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

195.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

196.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Actinium has sustained and continues to sustain significant damages. As a

result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

197.    Plaintiff, on behalf of Actinium, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

198.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Actinium.

200.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Actinium that was tied to the performance or artificially inflated valuation of Actinium, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

201.    Plaintiff, as a shareholder and representative of Actinium, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

202.    Plaintiff, on behalf of Actinium, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

203.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Actinium, for which they are legally responsible.

205.    As a direct and proximate result of the Individual Defendants' abuse of control, Actinium has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206.    Plaintiff, on behalf of Actinium, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

207.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Actinium in a manner consistent with the operations of a publicly held corporation.

209.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Actinium has sustained and will continue to sustain significant damages.

210.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

211.    Plaintiff, on behalf of Actinium, has no adequate remedy at law.

### SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

212.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the

Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

214.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

215.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

216.    Plaintiff, on behalf of Actinium, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Seth, Desai, Vusirikala, and Giralt for Contribution Under Sections 10(b) and 21D of the Exchange Act**

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

218.    Actinium and Defendants Seth, Desai, Vusirikala, and Giralt are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Seth's, Desai's, Vusirikala's, and Giralt's willful and/or reckless violations of their obligations as officers, directors, and/or fiduciaries of Actinium.

219.    Defendants Seth, Desai, Vusirikala, and Giralt, because of their positions of control and authority as officers, directors, and/or fiduciaries of Actinium, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Actinium, including the wrongful acts complained of herein and in the Securities Class Action.

220.    Accordingly, Defendants Seth, Desai, Vusirikala, and Giralt are liable under 15

U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

221.    As such, Actinium is entitled to receive all appropriate contribution or indemnification from Defendants Seth, Desai, Vusirikala, and Giralt.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Actinium, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Actinium;

(c)    Determining and awarding to Actinium the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Actinium and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Actinium and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

    2. a provision to permit the shareholders of Actinium to nominate at least three candidates for election to the Board;

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Actinium restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

<strong><u>JURY DEMAND</u></strong>

Plaintiff hereby demands a trial by jury.

Dated: May 5, 2025

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
     shashmi@thebrownlawfirm.net
     edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, George Georges, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative and Direct Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4 __ day of May, 2025.

Signed by:

*George Georges*

DB4DA5BZB08847C...

George Georges